FISCHER, INC., a corporation, et al.,
Appellants,

v.

STANDARD BRANDS, INC., a corporation,
Appellee.

No. 55217.

Supreme Court of Iowa.

Feb. 21, 1973.

Clausen, Hirsh, Miller & Gorman, Chicago, Ill., and Reynolds, Kenline, Roedell, Breitbach & McCarthy, Dubuque, for appellants.

Klauer, Stapleton, Ernst, Sprengelmeyer, & Schrup, Dubuque, for appellee.

Heard before MOORE, C. J., and MASON, RAWLINGS, REYNOLDSON and McCORMICK, JJ.

MOORE, Chief Justice.

Plaintiffs, property owners, business operators and insurance carriers, appeal from judgment on jury verdict denying their damage claims resulting from spread of fire from defendant's building.

In division I of their combined petition plaintiffs alleged five specifications of negligence. In division II they alleged general negligence under the doctrine of res ipsa loquitur. The trial court sustained defendant's motion to strike and withdraw division II from the jury. The allegations of division I, including four of the pleaded specifications, were submitted to the jury. Verdicts in favor of defendant on the claim of each plaintiff were returned.

On this appeal plaintiffs jointly assert the trial court erred in (1) not striking the opinion of defendant's expert given in response to a hypothetical question, (2) striking that portion of plaintiffs' petition premised upon the doctrine of res ipsa loquitur, (3) denying the motion to amend their petition to conform to the proof and (4) refusing to grant a new trial on the ground of jury misconduct.

The printed record of 503 pages of course can only be summarized as necessary to consider the assigned errors. In April 1965 plaintiff, Fischer, Inc., and defendant, Standard Brands, Inc., occupied separate portions of an installation known as "Fischer Complex", located on the Mississippi riverfront between the Third and Sixth Street extensions in Dubuque. The two buildings separated only by a wall in the complex were separately owned, operated and maintained by Fischer and Standard. The other plaintiffs owned or insured various products stored in Fischer's cold storage operation. Fischer provided the ammonia cooling system for the entire plant, including the egg-cooler room of Standard. Otherwise the two companies ran completely separate operations. The electric power company ran separate lines to Fischer and Standard. There was no pooling of resources or employees between the companies.

Standard's premises were used as an egg-processing plant. The raw product was received in an enclosed dock and then moved into Standard's egg-cooler room before being transferred to the breaking and processing room. Upon completion of Standard's processing the eggs were taken

through a door to Fischer's sharp freezer room for storage.

The loading dock was normally heated by two Reznor suspended gas heaters. There were several electrical outlets on the dock. The dock and egg-cooler room had overhead lights. On the night of the fire the gas to the heaters had been shut off.

The fire here involved broke out in the early morning hours of April 23, 1965. The egg-cooler room and the receiving dock were the areas immediately involved. At that time the Fischer Complex was completely surrounded by flood waters from the Mississippi River. The water on the loading dock was two or three feet deep and was being held out of the egg-cooler room by sandbags, plastic sheeting, roofing tar and two dewatering pumps, one electric and the other a new Sears Homart gasoline engine-driven pump. Standard had completely halted its egg-processing operation. Only a small crew remained to protect the building from the flood. One of those in Standard's area was Richard Swartz an employee of Creamery Package Manufacturing Company. He had earlier set up the electric pump to remove flood water seepage. The night of the fire he was voluntarily engaged in aiding Standard.

There was water no more than ankle deep in the egg-cooler room, caused by seepage. Some 6000–8000 empty egg crates were stored in the cooler room, resting on pallets eight inches above floor level and thus out of the water. The rows of egg crates were stacked eight to ten crates high. The bottom crates had absorbed some moisture, were damp and bulging slightly.

Swartz had been in the cooler room about 2:45 a. m. on April 23 checking the pumps. He visually checked the electric and gasoline pump which were operating, some distance apart, in the cooler room. Both were pumping water through hoses made of polyvinylchloride, a material which, if burnt, smells like overheated electrical wires. Both pumps were functioning normally. There was no fire or disturbance at that time. Swartz went to the plant office to finish a cup of coffee, then went back near the cooler room. He smelled smoke like from an overheating electric motor. He went into the cooler room to check the electric pump. It was cool. He heard a crackling sound like a fire and started toward the gasoline pump. When about halfway there he observed burning egg crates in the vicinity of the gasoline pump. The flames obscured the pump and its connections from his vision. Swartz ran for help and on his return in a few minutes found the cooler room filled with dense black smoke. Soon thereafter, with others, including Fischer employees, Swartz left the complex in a boat. As the fire spread, flames shot 40 to 50 feet in the air, electrical lines were melted, steel beams twisted and concrete walls between Fischer and Standard crumbled. Both parts of the complex and their contents were badly damaged before the city firefighters brought the fire under control. The amounts of plaintiffs' damages are not an issue on this appeal.

Plaintiffs' fire investigation expert, Henry S. Morton, made an on-site inspection of the premises approximately four months after the fire. It was his opinion the fire was caused in one of several fashions: creeping or walking of the gasoline-powered pump putting it in contact with the egg crates; the collapse of some of the egg crate stacks causing one or more to fall upon the gasoline pump engine; overheating of the pump or a fuel system malfunction.

Defendant's fire investigation expert, Jay Trexler, in response to a hypothetical question expressed the opinion the fire was caused by some electrical malfunction. He theorized the electric fans on the Reznor suspended gas heaters being thermostatically controlled had continued to run, had overheated and shorted out the wiring causing a fire which reached the egg crates. He described the electrical outlets

along the dock and opined the flood water could have been a factor in the electrical malfunction.

I. Plaintiffs-appellants first argue the trial court erred in overruling their motion to strike Trexler's answer to the hypothetical question. Trexler had not visited the site until the building had been restored to substantially its original condition. He listened to the trial testimony and examined the many exhibits which had been received in evidence. After stating in detail his education and experience in fire examinations and fire causes, he was asked a lengthy hypothetical question. He was asked to assume many, if not all, of the facts referred to in the evidence. The printed question set out in the record covers 14 pages. No useful purpose would be served by setting it out in this opinion.

When Trexler was asked to state his opinion plaintiffs' counsel stated:

"For the record purposes, the plaintiffs are making no objections to this question at this time, reserving the right to move to strike the opinion at a later time after cross-examination of the witness, without waiver of the basic objections which might be demonstrated upon cross-examination as to the qualifications of the basis of the witness's opinion."

Trexler testified:

"My opinion would be that this fire was caused by some malfunction of an electrical nature in the northwest corner of the cooler, north and west of the fire area, and that is my opinion."

On further direct examination he stated in detail the facts on which he based his opinion. He gave his reasons why he disagreed with the opinion of plaintiffs' expert.

Trexler was then subjected to thorough exhaustive cross-examination regarding facts assumed and his reasoning. The report thereof covers 146 pages of the record and took most of one full trial day.

At the close of cross-examination plaintiffs' counsel moved to strike Trexler's answer to the hypothetical question first for lack of qualifications (not pursued on appeal):

" * * * and secondly, because the answer to the hypothetical question has now been indicated by the cross-examination of this witness to have been given in fact upon innumerable assumptions not contained in the hypothetical question, assumptions which in turn necessarily are mere opinions and conjectures so that not only is the opinion given in answer to the hypothetical question not based upon the facts submitted in the hypothetical question, but is also now clearly based conjecture upon conjecture upon conjecture, and as a result would be an incompetent opinion and conclusion even if it were not beyond the scope of the hypothetical question."

■ We are committed to a liberal rule on the admission of opinion evidence. The matter rests largely within the discretion of the trial court. The liberal rule does not mean opinion evidence is admissible over proper objection where there has been no proper foundation as to the qualifications of the expert or the form and content of the questions asked. Karr v. Samuelson, Inc., Iowa, 176 N.W.2d 204, 209, and citations. See also 19 Drake L. Rev. 245, Opinion Evidence in Iowa at page 270. The trial court will be reversed only on a clear showing of abuse of discretion. Rasmussen v. Thilges, Iowa, 174 N.W.2d 384, 387; Dougherty v. Boyken, 261 Iowa 602, 607, 155 N.W.2d 488, 491 and citations.

Here the thrust of plaintiffs' contention is that their cross-examination revealed "innumerable assumptions not contained in the hypothetical question." But the motion to strike Trexler's opinion did not specify any of them.

In Schmitt v. Jenkins Truck Lines, Inc., Iowa, 170 N.W.2d 632, 659, we quote this

from 4 C.J.S. Appeal and Error § 290bb, page 887:

"In order to preserve any question for appellate review, a motion to strike evidence which has been erroneously admitted must specify the grounds or reasons for striking the evidence; and no reasons or grounds other than those urged in the trial below can be presented to the appellate court."

■ There are two primary reasons requiring specific objections to a hypothetical question (1) to alert the trial judge to the alleged insufficiencies so that he may consider and rule on each and (2) to point up the defect or defects to give opposing counsel an opportunity to correct or eliminate the defect. A general objection is not sufficient on which to rely on appeal. Pastour v. Kolb Hardware, Inc., Iowa, 173 N.W.2d 116, 124; In re Estate of Ronfeldt, 261 Iowa 12, 27, 152 N.W.2d 837, 846; Kunzman v. Cherokee Silo Co., 253 Iowa 885, 893, 114 N.W.2d 534, 539. See also 31 Am.Jur.2d, Expert and Opinion Evidence, section 64.

■ Plaintiffs' stated grounds to strike Trexler's answer to the hypothetical question were general and not sufficiently specific. We find no error in plaintiffs' first assigned error.

II. Plaintiffs-appellants' second assigned error is that the trial court erred in withdrawing and not submitting to the jury division II, bottomed on the doctrine of res ipsa loquitur. The trial court at the close of plaintiffs' case in chief on defendant's ، motion withdrew division II from the jury. The problem was again raised and thoroughly considered by the trial court on plaintiffs' motion for new trial.

As we point out in Pastour v. Kolb Hardware, Inc., supra, Iowa, 173 N.W.2d 116, 125, volumes have been written by this court and by courts in other jurisdictions involving the doctrine of res ipsa loquitur. Our cases and the many facets of the doctrine are exhaustively reviewed in 18 Drake L.Rev. No. 1, pages 1 through 25, in the article "Res Ipsa Loquitur in Iowa". For an earlier review see 35 Iowa L.Rev. 393.

As particularly applicable here, these propositions are now well established.

The doctrine is a rule of evidence originally based on the theory that he who has charge of the thing causing the injury or damage either knows the cause of the accident or has the best opportunity of ascertaining it. Edwards v. Des Moines Transit Co., 251 Iowa 163, 166, 99 N.W.2d 920, 921 and citations.

■ The mere occurrence of a fire with resultant injuries or damages does not permit an inference of negligence as a fire might occur in the absence of negligence. Wilson v. Paul, Iowa, 176 N.W.2d 807, 809; Tedrow v. Des Moines Housing Corp., 249 Iowa 766, 769, 87 N.W.2d 463, 465.

■ Under the doctrine of res ipsa loquitur, where (1) injury or damage is caused by an instrumentality under the exclusive control of defendant and (2) the occurrence is such as in the ordinary course of things would not happen if reasonable care had been used, the happening of the injury or damage permits, but does not compel, an inference defendant was negligent. Pastour v. Kolb Hardware, Inc., supra, Iowa, 173 N.W.2d 116, 125 and citations.

In Wilson v. Paul, supra, Iowa, 176 N.W.2d 807, 809, we state:

"In order for the doctrine of res ipsa loquitur to apply, plaintiff must establish the cause of the fire. ' * * * [T]he doctrine of res ipsa loquitur does not raise any [inference] as to what did occasion the injury; but, after the evidence has established the thing which did occasion the injury, then under certain circumstances, this doctrine will raise [an inference] of negligence.' Orr v. Des Moines Elec. Light Co. (1928), 207 Iowa 1149, 1155, 222 N.W. 560, 562."

In Wilson v. Paul, supra, on which plaintiffs heavily rely, the cause of the fire, a blow torch exclusively under control of the defendants, was sufficiently established by a combination of direct and circumstantial evidence. It is readily distinguishable factually from the case at bar.

■ In the record before us plaintiffs' evidence refers to four possible causes of the fire. Defendant's evidence claims other causes thereof.

We hold plaintiffs failed to establish proper foundation for the submission of the doctrine of res ipsa loquitur to the jury.

■ III. Plaintiffs-appellants' next contend the trial court erred in denying them permission to amend their petition at the close of the evidence. They sought to plead five new specifications of negligence based primarily on the testimony of defendant's witness, Trexler, regarding possible electrical malfunctions.

This cause was tried five and a half years after the fire. As observed by the trial court, Trexler's deposition had been taken weeks before trial and plaintiffs were well aware of defendant's theory of electrical malfunctions.

■ In Trask v. Gibbs, Iowa, 200 N. W.2d 565, filed September 19, 1972, we quite thoroughly discuss the principles of law applicable to proposed amendments. The trial court has broad discretion in permitting or denying amendments to conform to the proof at the close of all the evidence. While liberality in permitting amendments is the general rule, this liberality has limits, to be determined by the sound discretion of the trial court. This court will not interfere unless an abuse of discretion appears. We find no such abuse under the record before us.

IV. The remaining assigned error concerns juror misconduct. As part of their motion for new trial plaintiffs asserted:

"There was misconduct of the jury in that a juror conducted personal experiments with a gasoline engine, placing its exhaust near or against combustible material, and reported the results of such experiments to the entire jury during its deliberations. This misconduct went to the heart of Plaintiffs' theory of source of ignition of the fire and is extremely prejudicial and prevented Plaintiffs from having a fair and impartial trial upon the record as made. In support of this ground, there is attached and made a part hereof, the affidavit of Donald W. Freymann, foreman of the jury."

Plaintiffs also attached affidavits of all other members of the jury.

The foreman's affidavit stated:

"I, *Donald W. Freymann*, being first duly sworn, on oath state that:

"I was the foreman of the jury in Fischer, Inc., et al., vs. Standard Brands, Law #38420, in the District Court of Dubuque County, Iowa.

"During the course of the trial, one of the jurors conducted experiments with a gasoline engine and combustible material placed near its exhaust, and reported the results of his experiments to the jury during its deliberation as negative in the production of ignition. This did not influence my decision and I objected to its relevancy."

The affidavits of seven of the jury members were substantially the same as that of the foreman, except the reference to an objection to relevancy. The affidavit of three jurors states they did not recall the incident.

The affidavit of juror Lyle W. Scheppele stated:

"I, *Lyle W. Scheppele*, being first duly sworn, on oath state that:

"I was a member of the jury in Fischer, Inc., et al, v. Standard Brands, Law

#38420, in the District Court of Dubuque County, Iowa.

"During the course of the trial, I conducted an experiment with a gasoline engine and combustible material placed near its exhaust, and reported the results of the experiment to the jury during its deliberations as negative in the production of ignition.

"In my opinion, the test only confirmed my thoughts about the pump. I did not try to influence any other juror by this because in my mind all of the jurors were convinced that there had been no negligence on the part of Standard Brands. It had no prejudicial effect on my decision."

The trial court's order denying plaintiffs' motion for a new trial includes: "Admittedly, there was misconduct by one juror in that he conducted experiments with a gasoline engine and communicated the results to some of his fellow jurors."

After stating several legal principles and citing our holdings in support thereof the court observed, "The trial court has wide discretion in determining whether alleged misconduct of jurors is prejudicial." Then after quoting the last paragraph of Schepple's affidavit the trial court said, "It is the conclusion of this Court that the misconduct complained of was not prejudicial.

"We have often considered the question of whether a new trial should be granted because of misconduct of jurors. In order to justify a new trial on the basis of misconduct of jurors it must appear the misconduct was calculated to, and it is reasonably probable it did, influence the verdict. Townsend v. Mid-America Pipeline Co., Iowa, 168 N.W.2d 30, filed May 6, 1969; Fordyce v. Cappel, 257 Iowa 763, 765, 133 N.W.2d 664, 665; Mead v. Scott, 256 Iowa 1285, 1290, 130 N.W.2d 641, 644; Hackaday v. Brackelsburg, 248 Iowa 1346, 1350, 85 N.W.2d 514, 517; Mongar v. Barnard, 248 Iowa 899, 908, 82 N.W.2d 765, 771,

772; Fagen Elevator v. Pfiester, 244 Iowa 633, 641, 56 N.W.2d 577, 581.

"Misconduct of the jury is not a ground for new trial unless it 'materially affects * * * substantial rights' of the 'aggrieved party' or 'prevented the movant from having a fair trial'. Rule 244, R.C.P.; Mead v. Scott, supra. See also 10 Drake Law Review 126, 129.

"The trial court has wide discretion in determining whether alleged misconduct of the jurors is prejudicial. Unless abuse of discretion is clearly shown his decision should not be reversed. Rancho Grande, Inc. v. Iowa State Highway Com'n, Iowa, 261 Iowa 861, 156 N.W.2d 293, 299; Mead v. Scott, supra; Harden v. Illinois Central R. Co., 253 Iowa 341, 343, 112 N.W.2d 324, 325; Hutchinson v. Fort Des Moines Com. Servs., 252 Iowa 536, 543, 107 N.W.2d 567, 571; Bashford v. Slater, 250 Iowa 857, 867, 96 N.W.2d 904, 910; Turner v. Hansen, 247 Iowa 669, 674, 75 N.W.2d 341, 343, and cited authorities."

In Re Estate of Cory, Iowa, 169 N.W.2d 837, 845. For like statements of legal principles see our most recent case of State v. Jackson, Iowa, 195 N.W.2d 687, 689, 690.

Our problem is not limited to the question of abuse of discretion in finding no prejudice as it is amply clear from the record the trial court gave overriding weight to the statements of the jurors in their affidavits that the reported experiment did not influence their verdict. The trial court erred in doing so.

■ We have consistently held that a juror may state by affidavit or other means what actually took place in the jury room since actual happenings do not inhere in the verdict, a juror however may not by affidavit or otherwise state what influenced the jury in reaching its decision or verdict as such showing inheres in the verdict. State v. Jackson, Iowa, 195 N.W.2d 687, 690; State v. Albers, Iowa, 174 N.W.

2d 649, 656; Bashford v. Slater, 250 Iowa 857, 867, 96 N.W.2d 904, 910; Hicks v. Goodman, 248 Iowa 1184, 1195, 85 N.W.2d 6, 12. See also 10 Drake L.Rev. 126, 130.

In Hackaday v. Brackelsburg, 248 Iowa 1346, 1350, 85 N.W.2d 514, 516, we say:

"However, statements in the jurors' affidavits attached to defendant's resistance to the motion for new trial to the effect the verdict was based on the evidence and instructions of the court, uninfluenced by what juror Abell is claimed to have said, should not be considered. We have repeatedly held that although what transpired during deliberations of the jury may be shown, affidavits of jurors are not competent to show whether the verdict was, or was not, affected by what happened. Whether the verdict was so affected is a matter of opinion which inheres in the verdict."

As early as 1860 this court recognized the above stated rule. Stewart v. The Burlington & Missouri River Railroad Co., 11 Iowa 62, 64 states:

" * * * Where a paper which is capable of influencing the jury on the side of the prevailing party goes to the jury by accident, and is read by them the verdict will be set aside although the jury may think they were not influenced by such paper, it being impossible for them to say what effect it may have had on their minds. * * *."

In the instant case the juror Scheppele conducted an experiment and gathered evidence without the knowledge of the parties. That evidence admittedly was given to the jury during deliberation. It went to a key point in plaintiffs' case. Thus evidence favorable to defendant was given to the jury. Plaintiffs had no opportunity to cross-examine Scheppele. We conclude that misconduct was reasonably calculated to and probably did influence the jury. Plaintiffs were thereby denied a fair trial. We hold a new trial should have been granted on this basis. In strong support of this conclusion see King v. Barrett, Iowa, 185 N.W.2d 210, 213.

Reversed and remanded for new trial.